**JUDGE HARJANI**

AO 91 (Rev. 11/11) Criminal Complaint　　　　　　　　　　　　　　　　AUSA Paige A. Nutini (312) 697-4071

**FILED**
**9/23/2020**
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | CASE NUMBER: **20 CR 655** |
|---|---|
| v. | UNDER SEAL |
| MICHAEL GROSS | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 841(a)(1) | On or about September 8, 2020, at Hazel Crest, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant, MICHAEL GROSS, knowingly and intentionally distributed controlled substances, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1). |

This criminal complaint is based upon these facts:

  X  Continued on the attached sheet.

NICHOLAS ROWELL
Special Agent, Drug Enforcement Administration

Pursuant to Fed. R. Crim. P. 4.1, this complaint is presented by reliable electronic means. The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: September 23, 2020

*Judge's signature*

City and state: Chicago, Illinois　　　SUNIL R. HARJANI, U.S. Magistrate Judge
　　　　　　　　　　　　　　　　　　*Printed name and title*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

## AFFIDAVIT

I, Nicholas Rowell, being duly sworn, state as follows:

1. I am a Special Agent with the Drug Enforcement Administration ("DEA"), and have been so employed since 2004. Prior to being employed with DEA I served with the Hammond Indiana Police Department for approximately three years.

2. As part of my training as a Special Agent, I received specialized training in the means and methods by which individuals and drug trafficking organizations conduct their illegal drug trafficking activities, as well as in the use of various investigative techniques used to uncover unlawful drug trafficking. I have also participated in multiple investigations involving illegal drug trafficking. Based on my training and experience, I am familiar with the ways in which drug traffickers conduct their drug trafficking business, including, but not limited to, their methods for concealing narcotics, packaging narcotics, and distributing narcotics. My current responsibilities include the investigation of narcotics trafficking offenses and money laundering offenses.

3. This affidavit is submitted in support of a criminal complaint alleging that MICHAEL GROSS violated Title 21, United States Code, Sections 841(a)(1) (the "**Subject Offense**"). Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging GROSS

with distribution of controlled substances, I have not included every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendants committed the **Subject Offense** alleged in the complaint.

4. This affidavit is based on, among other things (a) my personal knowledge of the facts and circumstances of this investigation described below; (b) information provided by other law enforcement officers, including oral and written reports that I have received from other law enforcement officers; (c) information obtained from witnesses, including confidential sources working for the DEA or other law enforcement agencies; (d) consensually recorded communications and meetings; (e) physical surveillance conducted by law enforcement; and (f) my training and experience and the training and experience of other law enforcement officers involved in this investigation.

I. FACTS SUPPORTING PROBABLE CAUSE

  A. Background of the Investigation

5. In summary, in approximately August 2020, a Hammond Police Department confidential source, who has since been signed up with DEA, (the "CS") identified MICHAEL GROSS as distributing heroin in the Glenwood, Illinois area.[1]

---

[1] The CS has cooperated with law enforcement for several months. Hammond Police Department Detectives approached the CS, who they believed to be attempting to purchase crack/cocaine from a suspected drug house, and asked him to voluntarily cooperate by making controlled purchases in exchange for monetary compensation. To date, the CS has been paid approximately $4,000 by DEA and Hammond Police Department. The CS has provided timely and accurate information that has been corroborated by law enforcement through controlled buys, consensual recordings, phone records,

2

6. In summary, and as explained in further detail below, on or about August 5, 2020, at law enforcement's direction, the CS conducted a controlled purchase of approximately .62 grams of a mixture or substance containing heroin and fentanyl from GROSS in exchange for approximately $300. On or about August 11, 2020, at law enforcement's direction, the CS conducted a controlled purchase of approximately 0.5 grams of a mixture or substance containing heroin and fentanyl from GROSS in exchange for approximately $300. On or about August 27, 2020, at law enforcement's direction, the CS conducted a controlled purchase of approximately 1.137 grams of a mixture or substance containing heroin and fentanyl from GROSS in exchange for approximately $500. On or about September 8, 2020, at law enforcement's direction, the CS conducted a controlled purchase of approximately .974 grams of a mixture or substance containing heroin and fentanyl from GROSS in exchange for approximately $500.

### B. The CS Informed Law Enforcement About GROSS's Narcotics Trafficking.

7. On or about July 31, 2020, the CS identified to the DEA an individual named MICHAEL GROSS who sold heroin on the south side of Chicago, including the south suburbs of Chicago and the Hammond, Indiana area. The CS identified the phone numbers (708) XXX-1666, and (708) XXX-1274 as belonging to GROSS. According to the CS, s/he has known GROSS since middle school, or for more than ten years, and has been purchasing narcotics from GROSS for the past three years.

---

and law enforcement reporting. The CS has not been charged with any offense related to his suspected drug purchase activity. The CS has a prior arrest for battery.

According to the CS, GROSS drives a brown pickup truck with Illinois license plate number 2621651B. According to Illinois Secretary of State records, this vehicle is registered to GROSS at 132 East Rose Street, Glenwood, Illinois—the address where the CS knows GROSS to live. Additionally, on or about July 31, 2020, the CS identified an Illinois driver's license photograph of GROSS as the person s/he knows as GROSS, and the person s/he has been purchasing narcotics from.

      **C.     On August 5, 2020, GROSS Distributed Approximately .62 Grams of a Mixture and Substance Containing Heroin and Fentanyl to the CS**

8.     On or about August 4, 2020, at the direction of law enforcement, the CS contacted GROSS by telephone at (708) XXX-1274, and informed GROSS that s/he wanted to purchase $300 worth of heroin. This phone call was not recorded or in the presence of law enforcement.

9.     On or about August 5, 2020, at approximately 12:00 p.m., law enforcement met with the CS, searched the CS for contraband and large amounts of currency with negative results, equipped the CS with an audio and video recording device, and provided the CS with approximately $300 in pre-recorded agency funds to purchase narcotics from GROSS.

10.     At approximately 12:00 p.m., at law enforcement's direction and in their presence, the CS placed a consensually recorded phone call to GROSS.[2] During the

---

[2] Unless otherwise noted, the consensually recorded phone calls were recorded using the audio recording devices worn by the CS and by a law enforcement agent working in an undercover capacity. Law enforcement was able to identify GROSS's voice based upon: (1) the CS's familiarity and identification of GROSS's voice; (2) surveillance of GROSS at the location and times discussed during or after consensually recorded phone calls; and (3) a

call the CS said s/he was at the "Wal-Mart on 111th."[3] The CS asked GROSS to "come this way." GROSS then asked the CS what s/he was "trying to do." The CS responded "three bills." Law enforcement is aware that "three bills" is code for $300, which is the amount of heroin the CS was directed to buy on behalf of law enforcement.

11. A short time later, law enforcement dropped the CS off near the Wal-Mart Parking lot. Law enforcement maintained surveillance of the CS as s/he awaited the arrival of GROSS.

12. At approximately 1:11 p.m., law enforcement officers conducting physical surveillance observed a brown pickup truck bearing Illinois license plate 2621651B—registered to GROSS at 32 E. Rose St. Glenwood, Illinois, 60425—pull into the parking lot and park near the CS. Law enforcement observed as the CS walked over to the truck.

13. According to the CS, and as confirmed by the audio and video recording, GROSS, who is visible on the video recording, and the CS had a brief conversation while GROSS sat in his vehicle and the CS stood next to the driver's door. According

---

comparison with the voice heard during a consensually recorded meeting with GROSS (as observed by physical surveillance).

[3] Some of the consensually recorded conversations and meetings (the "recorded conversations") have been summarized in this Affidavit. I based the language quoted from the recorded conversations throughout this Affidavit on a preliminary review of the recorded conversations—and not on final transcripts of the recorded conversations. The times listed for the recorded conversations are approximate. The summaries of the recorded conversations do not include all statements made or topics covered during the course of the recorded conversations. I based my interpretations on the content and context of the recorded conversations, events occurring before or after the recorded conversations, information received from the CS, my knowledge of the investigation as a whole, my training and experience, and the training and experience of other law enforcement officers involved in this investigation.

to the CS, GROSS then handed the CS a plastic baggie and the CS provided GROSS with $300 in payment. The hand-to-hand transaction is not visible on the recording. However, as the CS walks away from the vehicle, the plastic baggie with a white powdery substance is visible in the CS's hand.

14. After the exchange, law enforcement observed the brown pickup truck depart the parking lot.

15. The CS returned on foot to law enforcement's surveillance vehicle, and s/he immediately provided law enforcement officers with the plastic baggie containing a white, powdery substance. Law enforcement submitted the substances contained in the baggie to DEA's North Central Laboratory, which confirmed that the baggie contained a total net weight of approximately .62 grams of a mixture and substance containing a detectable amount of heroin and fentanyl.

16. Law enforcement searched the CS for contraband and large amounts of money, including the $300 in United States currency previously provided to the CS, with negative results and recovered the audio/video recording device.

### D. On August 11, 2020, GROSS Distributed Approximately 0.5 Grams of a Mixture and Substance Containing Heroin and Fentanyl to the CS

17. On or about August 10, 2020, at the direction of law enforcement, the CS contacted GROSS by telephone at (708) XXX-1274, and informed GROSS that s/he wanted to purchase $300 worth of heroin. The CS and GROSS agreed the transaction would occur at GROSS's residence located at 132 E Rose Street, Glenwood, Illinois. This phone call was not recorded or in the presence of law enforcement.

6

18. On August 11, 2020, at approximately 2:45 p.m., law enforcement established surveillance on 132 E Rose Street, Glenwood, Illinois.

19. On or about August 11, 2020, at approximately 3:00 p.m., law enforcement met with the CS, searched the CS for contraband and large amounts of currency with negative results, equipped the CS with an audio and video recording device, and provided the CS with approximately $300 in pre-recorded agency funds to purchase narcotics from GROSS.

20. At approximately 3:00 p.m., at the direction of law enforcement, the CS made a recorded call to GROSS at (708) XXX-1274. During the call, the CS and GROSS had a social conversation about fishing. The CS then asked GROSS if he was at the "crib?" GROSS responded, asking the CS what s/he was "trying to do." The CS replied, "three bills." As previously referenced, law enforcement understood "three bills" to mean $300, which is the amount of heroin the CS requested from GROSS.

21. At approximately 3:02 p.m., the CS exited law enforcement's vehicle to travel several blocks on foot to 132 E. Rose Street, while law enforcement maintained surveillance. During this time, the CS made a call to GROSS at (708) XXX-1274, which was captured on the audio and video recording device. The CS told GROSS that he was on his way and would be "over there in like two minutes."

22. At approximately 3:11 p.m., law enforcement officers conducting surveillance observed the CS arrive in the area of 132 E. Rose Street and make contact with GROSS near the garage of the residence.

7

23. Law enforcement officers then observed the CS enter the garage. According to the CS, and as confirmed by the audio and video recording, GROSS and a female—who the CS identified as GROSS's girlfriend, Individual A—were present in the garage. According to the CS, the CS then conducted a hand-to-hand transaction with GROSS, exchanging the $300 for a plastic baggie. GROSS is briefly visible on the video recording, but the transaction itself was not captured on video. The audio recording captures GROSS say something to the effect of "I only got, it's like maybe $280," referring to the amount of narcotics he had for the CS. At approximately 3:15 p.m., law enforcement observed the CS exit the garage and walk from the area of 132 E. Rose Street.

24. The CS returned on foot to law enforcement's surveillance vehicle, and s/he immediately provided law enforcement officers with the plastic baggie containing a white, powdery substance. Law enforcement submitted the substance contained in the baggie to DEA's North Central Laboratory, which confirmed that the baggie contained a total net weight of approximately 0.5 grams of a mixture and substance containing a detectable amount of heroin and fentanyl.

25. Law enforcement searched the CS for contraband and large amounts of money, including the $300 in United States currency previously provided to the CS, with negative results and recovered the audio/video recording device.

    **E.**     **On August 27, 2020, GROSS Met with His Source of Supply and Distributed Approximately 1.137 Grams of a Mixture and Substance Containing Heroin and Fentanyl to the CS**

8

26. During the week of August 24, 2020, the CS informed law enforcement that according to GROSS, if the CS were to purchase approximately $500 worth of heroin from GROSS, then GROSS would take the CS along with him to acquire the heroin from his Source of Supply (SOS). The CS stated that based on conversations with GROSS—which were not recorded or in the presence of law enforcement—s/he believed that GROSS's SOS lived in or near Markham, Illinois.

27. On or about August 27, 2020, at the direction of law enforcement, the CS made arrangements to meet GROSS at his residence (132 East Rose Street, Glenwood, Illinois), and travel with GROSS to an unknown location in or near Markham, Illinois to purchase approximately $500 worth of heroin from GROSS's SOS. This phone call was not recorded or in the presence of law enforcement. The CS informed law enforcement that based on conversations with GROSS, s/he understood that GROSS intended to combine the money from the CS with GROSS's own money to get a better price from his SOS for the narcotics.

28. At approximately 11:30 a.m., law enforcement met with the CS, searched the CS for contraband and large amounts of currency with negative results, equipped the CS with an audio and video recording device, and provided the CS with approximately $500 in pre-recorded agency funds to purchase narcotics from GROSS and his SOS.

29. At the direction of law enforcement, at approximately 11:30 a.m., the CS made a recorded call to GROSS at (708) XXX-1274. During the call, the CS told GROSS he was just a few "minutes out."

30. At approximately 11:30 a.m., law enforcement established surveillance near GROSS's residence. According to the CS, and as confirmed by the audio and video recording, s/he learned from other occupants at the residence that GROSS was not home but would return shortly.

31. At approximately 11:51 a.m., law enforcement observed GROSS arrive at the residence in his brown pickup truck with Illinois license plate number 2621651B. Shortly thereafter, law enforcement observed the CS enter the front passenger's side of the vehicle with GROSS and drive away. Individual A was also in the back seat of the vehicle.

32. At approximately 11:57 a.m., law enforcement observed GROSS drive to a gas station located on Glenwood Dyer Road. The CS communicated with law enforcement via text message that GROSS was getting gas and then would travel to an auto parts store located on "Kedzie Road." Several minutes later, law enforcement observed as GROSS, Individual A, and the CS drove away from the gas station. According to the CS, shortly before arriving at the auto parts store, s/he provided $500 to GROSS for the narcotics.

33. At approximately 12:40 p.m., law enforcement observed GROSS's vehicle arrive at an auto parts store located at 17600 Kedzie Avenue, Hazel Crest, Illinois. Shortly thereafter, a black Dodge mini-van with Illinois license plate CF43006 parked next to GROSS's vehicle. The mini-van—a 2010 Dodge Passenger van registered to Individual B of 17861 Princeton Lane, Country Club Hills, Illinois—was occupied by a black male.

34. According to the CS, after parking the vehicle, GROSS handed a quantity of money to Individual A, including the $500 from the CS. Law enforcement then observed GROSS exit his vehicle and open the hood of his truck, apparently simulating vehicle problems. Individual A then exited GROSS's vehicle and approached the SOS, or Individual B, located on the driver's side of the mini-van for a brief moment before returning to GROSS's vehicle.

35. Several minutes later, law enforcement observed GROSS close the hood of his vehicle and re-enter the vehicle. According to the CS, once inside the vehicle, Individual A provided the CS with a plastic baggie in exchange for the $500 the CS had provided GROSS. This hand-to-hand transaction is not visible on the recording. Law enforcement then observed GROSS drive away from the area back to his residence at 132 E. Rose Street, Glenwood, Illinois, with Individual A and the CS in the vehicle.

36. At approximately the same time, the black mini-van registered to Individual B exited the parking lot and drove away from the area. Law enforcement followed the mini-van to a warehouse located near 16710 Richmond in Hazel Crest, Illinois. After a short period of time, law enforcement ceased surveillance.

37. The CS returned on foot to law enforcement's surveillance vehicle, and s/he immediately provided law enforcement officers with several plastic baggies containing a white, powdery substance. Law enforcement submitted the substances contained in the baggies to DEA's North Central Laboratory, which confirmed that

the baggies contained a total net weight of approximately 1.137 grams of a mixture and substance containing a detectable amount of heroin and fentanyl.

38. Law enforcement searched the CS for contraband and large amounts of money, including the $500 in prerecorded funds, with negative results and recovered the audio/video recording device.

### F. On September 8, 2020, GROSS Met with His Source of Supply and Distributed Approximately .974 Grams of a Mixture and Substance Containing Heroin and Fentanyl to the CS

39. On or about Tuesday, September 8, 2020, at the direction of law enforcement, the CS contacted GROSS by telephone at (708) 491-1274, and informed GROSS that s/he wanted to purchase $500 worth of heroin. GROSS agreed to take the CS to his SOS. This phone call was not recorded or in the presence of law enforcement.

40. At approximately 12:00 p.m., law enforcement established surveillance at 17861 Princeton Lane, Country Club Hills, Illinois—the address believed to be where Individual B resides. Law enforcement observed multiple vehicles in the driveway, including the black mini-van with Illinois license plate CF43006, registered to Individual B and used in the August 27th controlled purchase. At the same time, law enforcement also established surveillance at GROSS's residence located at 132 E. Rose Street, Glenwood, Illinois.

41. At approximately 1:50 p.m., law enforcement met with the CS, searched the CS for contraband and large amounts of currency with negative results, equipped

the CS with an audio and video recording device, and provided the CS with approximately $500 in pre-recorded agency funds to purchase narcotics from GROSS.

42. At approximately 1:57 p.m. the CS arrived on foot at GROSS's residence. Shortly thereafter, surveillance advised that Individual B was standing in his driveway (17861 Princeton Lane) talking on the phone.

43. At approximately 1:59 p.m., law enforcement observed as GROSS, Individual A, and the CS entered a red Chevrolet PT Cruiser with a temporary Illinois license plate.

44. Surveillance followed the vehicle as Individual A drove GROSS, who sat in the front seat, and the CS, who sat in the back passenger's side seat, to the same auto parts store from the August 27th controlled purchase, located at 17600 Kedzie Avenue, Hazel Crest, Illinois, and parked in the same area of the parking lot facing north.

45. At approximately 2:33 p.m., surveillance observed Individual B at 17861 Princeton Lane enter the passenger side door of a white Nissan truck with Illinois license plate 20939S (registered to Individual C), and an unidentified female enter the driver's seat. Law enforcement followed the vehicle as it left 17861 Princeton Lane.

46. At approximately 2:42 p.m., law enforcement observed the white truck with Individual B arrive at the auto parts parking lot and drive directly to the location of the parking lot where the PT Cruiser was parked. The truck stopped directly behind the PT Cruiser. Surveillance observed Individual B, who was wearing a light

blue hoodie sweatshirt, exit the passenger side door of the white truck and walk to the driver's window of the PT Cruiser, where Individual A was sitting. According to the CS, GROSS handed a quantity of money to Individual A, including the $500 from the CS, and Individual A gave that money to Individual B. Individual B then gave Individual A several plastic baggies, which Individual A passed to GROSS. This transaction was not captured on the recording.

47. Law enforcement surveillance then observed Individual B return to his vehicle and enter the front passenger seat, at which time the white truck drove away. Law enforcement followed the white truck drive back to 17861 Princeton Lane. The unidentified female exited the truck and entered the residence. Individual B exited the vehicle and remained outside until law enforcement terminated its surveillance.

48. Law enforcement surveillance also followed the PT Cruiser as it left the parking lot and Individual A drove towards GROSS's residence. According to the CS, GROSS then gave a plastic baggie to the CS in exchange for the $500 s/he had provided. While in route to GROSS's residence, the CS notified law enforcement via text message that GROSS wanted to stop and sell a small amount of narcotics to one of his customers. Law enforcement observed the PT Cruiser park at a gas station located at 123 Williams Street, Thornton, Illinois for a short period of time before continuing on to GROSS's residence.

49. The CS then departed GROSS's residence and returned on foot to law enforcement's surveillance vehicle. The CS immediately provided law enforcement officers with the plastic baggie containing a white, powdery substance. Law

14

enforcement submitted the substances contained in the baggies to DEA's North Central Laboratory, which confirmed that the baggies contained a total net weight of approximately .974 grams of a mixture and substance containing a detectable amount of heroin and fentanyl.

50. Law enforcement searched the CS for contraband and large amounts of money with negative results and recovered the audio/video recording device.

## II. CONCLUSION

51. For the reasons described above, I submit that there is probable cause to support a complaint charging that on or about September 8, 2020, in the Northern District of Illinois, and elsewhere, MICHAEL GROSS, knowingly distributed controlled substances, namely, a mixture and substance containing a detectable amount of heroin, a Schedule I Controlled Substance, and fentanyl (N-phenyl-N-[1-(2-phenylethyl)-4-piperindinyl] propanamide), a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

FURTHER AFFIANT SAYETH NOT.

_____
NICHOLAS ROWELL
Special Agent, Drug Enforcement Administration

SUBSCRIBED AND SWORN telephonically on September 23, 2020.

_____
Honorable SUNIL R. HARJANI
United States Magistrate Judge

15